Case number 183767 Mary Stewart v. City of Euclid et al. Oral argument not to exceed 15 minutes per side. Ms. Green for the appellant. Good morning. Good morning. May it please the court, my name is Jacqueline Green and I along with Sarah Gelsomino and Terry Gilbert represent Mary Stewart who is the administrator of the estate of her late son Luke Stewart. I'd like to reserve three minutes for rebuttal, please. Thank you. Luke Stewart, a 23-year-old young black man and father of two, was shot and killed by a defendant, Appellee Matthew Rhodes, on March 13, 2017 in Euclid, Ohio. Luke's mother, Mary Stewart, and his two siblings are here with us today. This case is, of course, subject to de novo review and we are here because of the district court's grant of summary judgment to Rhodes and the City of Euclid on the questions of one, whether a constitutional violation occurred here, two, whether Mr. Stewart's rights were clearly established, and three, the pendent question of whether Plaintiff's Monell claim against the City of Euclid should proceed. Appellant asks this court to reverse the decision of the district court in its entirety because a jury hearing this case will find that Matthew Rhodes shot and killed Luke Stewart not because he feared that Luke's driving would cause harm to himself or others, but because he wanted to stop Luke and prevent him from escaping or fleeing. We know this because Rhodes got into the car at the start of these events and he stayed in the car after Luke began to operate the vehicle to drive forward, to drive back, with two stops during that process where Rhodes could have exited. He chose not to. He stayed in the car and then when the car began to maneuver around onto the road, he remained in the vehicle compared to the other officer on the scene, Louis Catalani, who disengaged, got away from the vehicle, reported to the dispatch that the car had pulled off. Was there a concern from Officer Rhodes that the driving would create possibly a danger to the public or other people on the roadway? Not once in any of Officer Rhodes' statements to BCI or any investigative agency or in his deposition in this case has he ever cited a concern about danger to pedestrians or other motorists and public safety. He's never cited any of those as justification for his decision to shoot Luke Stewart. He's only ever cited an alleged fear about harm to himself. But we have significant disputes in the record that suggest that this fear is fabricated, that these are allegations created to justify the shooting. And so the car drove off without incident. It was not speeding as it drove down South Lake Shore. Rhodes testified that all Stewart was doing at the time was driving. He was not fighting Rhodes. Catalani said the vehicle did not swerve. It was not recklessly being operated on the road at that time. Then the car stops in the intersection for 10 to 15 seconds. Rhodes says it might have even possibly been longer than that. He chose yet to stay in the car, though he had ample opportunity to get out and get away. Did he have an obligation to back out of that car? This is not about an obligation to retreat prior to using deadly force. The issue is whether or not there was actually an imminent, an actual threat of death or serious physical harm at the time Rhodes shot. And his decision to stay in the vehicle, in fact, undermines any allegation that he had such a fear that that threat existed because he had a great opportunity to get out of the car. And instead he stayed in that vehicle, continued to beat on Luke, continued to tase him at that point in time. Was he justified in tasing the decedent? Was that OK when he tased him? Well, he was trying to gain compliance, and ultimately we're here to discuss the shooting. That is the major question here in this case. The tasing would have been OK. It would have been OK to gain compliance if it were not going to create a danger to himself or others on the road. At the time, there is guidance from, for example, plaintiff's police practices expert, who has said that tasing a driver can be dangerous. There is guidance in the tasing training that suggests that tasing a driver can be dangerous. Grabbing the driver would be dangerous, too, wouldn't it? Sorry? Grabbing the arms of the driver would be dangerous, right? It could be dangerous, only if the vehicle is operating in such a way that it is imminently creating a threat of death or serious physical harm to the public, which of course we know is not at issue here, or to Rhodes himself. And again, his conduct suggests that. But the point is that, I think from Judge Seiler, is that grabbing the driver could cause potentially the driver to lose control and create that danger. I think that's the question. But you say that grabbing the driver is OK? I would say that the concern about affecting the driving capacity of a person operating a vehicle and creating a dangerous situation is one of the issues that we face here. At that point in time, Rhodes was limited to non-deadly force options because he was not facing an imminent threat of death or serious physical harm. And that's the major question at issue in this case. So for purposes of our analysis, does it matter that Officer Rhodes might have in some way created or caused the dangerous situation through actions of either beating the driver, chasing the driver, remaining in the car, and whatever actions he took thereafter? It's certainly relevant to Plaintiff's Ohio State Law Claims for Reckless Conduct, which contains a far broader cross-section of events beyond just the question of whether or not the shooting was justified. It's also relevant to the question of the shooting in that Rhodes' creation of any dangerous situation, which he did do by tasing Luke Stewart as the vehicle started again, turning around the corner onto East 22nd Street. The moment that he tased Luke, he tased him when they were in the intersection and continued to do it as they started to move. This is in his statement to BCI. When he did that, this is the time that the vehicle jumped the curb. And so any reliance that he attempts to place on jumping the curb to justify his use of force is clearly within his control. He created that situation, and therefore he can't— But the vehicle did get up on the curb and drive on the sidewalk or something. It drove up on the curb and ended up going around the pole and then back onto the road. And notably, Luke Stewart managed to get the car around the pole and back onto the road as he was being tased by this officer and was then again driving safely down East 222nd Street, where, again, he wasn't speeding. The other officer, Catalani, said he was not traveling at an unreasonable rate of speed. What do you think the officer should have done? Just sat there and said, you better pull over here and we'll get some other people or something like that? Well, he never once actually ordered Luke Stewart to stop the vehicle, to get out of the vehicle. Those were orders that were not ever given to Luke Stewart. He had the capacity to call for backup. They were literally one block from the police station in the city, and they could have— The point is he could have engaged in other conduct. Luke not one time attempted to cause harm, to strike, to threaten Officer Rhodes, and he wasn't doing anything other than driving the vehicle. So the only question is whether driving the vehicle constituted an imminent threat of death or serious physical harm to Rhodes, and, in fact, it did not. Rhodes has admitted that he engaged in preemptive speculative shooting in this case in the absence of an immediate and actual threat. He told BCI that he shot Luke Stewart when the vehicle wasn't even in gear. Now, he claimed in his deposition, of course, that he was driving along and he was afraid they were going to hit a pole. But he told BCI, he said— Got pretty close to the pole, didn't he? He went around the pole, and the reason that happened was because Rhodes was tasing him, and he managed yet to get onto the road and drive. He got around the pole that was sitting on the sidewalk and went to clear up on the sidewalk? It was on the tree lawn on the right side of the road, and so he got back onto the road and was safely driving. And at that point, Rhodes says to BCI that Luke was not even—the car was not even in gear, and he was still trying to go forward, and he was saying, If we went forward, I was afraid something might happen. That's speculative. It's preemptive. That's not enough to shoot. So didn't the record show that the car never exceeded speeds of about 30 miles an hour in this encounter? Correct. How long did the whole encounter take? It was very short. It was over just a period of a couple of blocks right around the corner, and we know they stopped for 10 to 15 seconds in the middle. I don't know that we have exact time frames, but it was about a block and a half and a block and a half on either side of that intersection, so pretty short. In his deposition, Rhodes testified that he shot based on an alleged fear that they might strike a pole, but he admitted, of course, that this was not something that he knew was about to happen or really thought was facing him at the very moment he chose to shoot. I want to pull away from the facts for just a moment and ask you again to articulate the clear constitutional violation and then the clearly established right or law. Sure. So the relevant Fourth Amendment framework here for assessing constitutionality of use of deadly force, of course, involves the totality of the circumstances, and deadly force is only reasonable when the officer has probable cause to believe that a suspect poses a threat of serious— What's your best case on that? Well, I would say—I would just note that a more recent case in the Supreme Court, Plumhoff v. Rickert, though factually distinguishable, does establish a principle that the threat must be actual and imminent. It cannot be speculative, as Eppley has often attempted to point to. Now, for the question of clearly established law on this issue, there are a number of cases. There's a series of cases in the Sixth Circuit, and then, of course, we pointed to this Ninth Circuit case, Gonzales. But starting with Smith v. Cup, this case, of course, is factually a little bit different, but it says—it stands for the principle that if you're not facing that imminent threat of death or serious physical harm with a moving vehicle as a deadly weapon, then you cannot shoot. This principle, of course, continues on and applies to this case. In Godowa v. Bird, the court found that an officer is not entitled to qualified immunity because he was not in harm's way at that critical moment. And that's what we're trying to get at here. Was Rhodes actually in harm's way at the critical moment? The court reversed—was reversed for not viewing the evidence in a light most favorable to the plaintiff when considering the crimes that the fleeing driver had committed. Here, we have obstruction at best. There's no felonious assault. There's nothing along those lines, no violent crimes. Were any of these cases involving an officer who was inside the vehicle itself? Sure. Well, Gonzales v. City of Anaheim, which is a Ninth Circuit case from 2014— That's not clearly established for the Sixth Circuit. Well, it's not—it's not binding, of course, on this circuit, but it does reflect the evolution of the case law across the country and in the Supreme Court around cases that involve vehicles as deadly weapons. And Plumhoff v. Rickard flows out of this same kind of series of questions, which asks, is the threat imminent and actual at the time of the shooting? And Gonzales v. Anaheim is essentially factually identical to this case, again, from three years before it happened. And in that case, where there are disputed facts underlying whether a suspect was actually driving in a way that created an immediate risk of death or serious physical harm to the officer at the time of the shooting, and officers present no evidence of danger to anyone else in the public, etc., summary judgment is inappropriate. So I would point to those cases on the clearly established issue. I think it's briefed thoroughly. I see that I only have a few seconds left in my opening. I do just want to note very briefly that Rhodes has testified that at the first curb jump, he was not justified at that time in using deadly force. And then he testified that he didn't even recall the curb jump as part of his calculus in deciding to shoot. And so he's admitted that he wasn't allowed to shoot at the first curb jump. What changed between the first curb jump and the moment that he decided to shoot? What was the intervening event that caused him to finally suddenly have this fear that would justify shooting and killing Luke Stewart? He hasn't offered this explanation. So this case is ripe for a jury to decide. And for these reasons, we ask you to reverse the district court. Thank you. So you said he admitted that he wasn't justified at the first curb jump. What does he posit as the fact that occurred between the first and the second curb jump? What does he say changed? Was it his fear of kidnapping? Was it fear of being kidnapped? Or was it his fear of harm to the public? What was it that he articulated? He hasn't articulated anything. Thank you. Thank you. May it please the court, my name is Frank Scaldone, and I represent the city of Euclid and Officer Rhodes. I'd like to begin with what the court was just talking about with regard to clearly established law. The plaintiff obviously has the burden to demonstrate that there is a violation of clearly established law to impose liability or to strip the officer of qualified immunity. Here, there is no controlling authority in the Sixth Circuit. The two cases, well, I think there's a little bit of history with this. The Supreme Court in three cases, recent cases, has been emphatic of the specificity needed to establish a case law that will establish clearly established law, and those are in the Pauley case, the Wesley case, the Kinsella case. But the deadly force law is clearly established that the officer cannot use deadly force except in certain circumstances. So that's clearly established. So what we're getting at is whether or not those factors are present here that define whether or not the officer could use it. That's the highly generalized case law that the Supreme Court has cautioned against using to establish a violation of qualified immunity or to establish the case law has to have a similar fact pattern that gives clear and fair warning to officers and the law prohibits defendant's conduct. Existing precedent must have placed the constitutional question beyond debate, all but the plainly incompetent and those who knowingly violate the law. There simply is not a case out there that is on point. The two cases that the plaintiff cites in the Sixth Circuit, because it's just either established controlling authority or a robust consensus of persuasive authority. Here the controlling authority of Smith and Bird, both of those cases are easily distinguished because the officer was not inside the car. In both of them the officer was outside of the zone of danger when he used deadly force. Here that's a stark contrast to what's going on in this situation. This is an event that occurred over a minute long where the officer is struggling with Stewart, trying to get him to stop the car. All of his efforts have failed. This is a textbook increase in the use of force to try to gain compliance to stop the car, which without being too blunt is obviously presenting a danger to the public, which despite opposing counsel's representation. Did Rhodes ever ask him to stop and say stop the car? Absolutely. Rhodes' testimony is he said stop, stop, stop. That is the first line of trying to gain compliance, but it was certainly not the last. From there he's trying to struggle with him to get the keys turned off. Then he's trying to take the car out of gear. When he gets the car out of gear, Stewart puts the car back in gear. It's a miracle that the car isn't going faster than 30 or 35 miles an hour. I think that's as a result of Officer Rhodes struggling with him. You say it's a miracle that it wasn't going faster than that. I guess why? One of the things we look at in the transcript is the driver is constantly saying, why are you in my car? Why are you in my car? As the appellant's counsel says that there were a couple of stops, so the officer had an opportunity to exit the car. This was not a high-speed fleeing situation. The driver appeared to be in control of the car at all times. The facts that were going on in there, it was a desperate struggle, a desperate struggle to get control over the car. What we later learn and was suspected is that the driver was three times over the limit for alcohol to drive legally. These statements sound like he was impaired because he was calling him names and said, what are you doing in here? Was the officer in a police uniform or in civilian clothes? Absolutely. He was fully dressed, fully uniformed, fully trying to gain compliance. It was an odd situation, a terrifying situation, because you have Stewart who every time, as the use of force by Rhodes is going higher and higher, when he's using his hand to try and gain compliance, every time he's hit, says, that didn't hurt me, essentially saying, that didn't hurt me. When he reaches to use his taser, again, as he's going down the line to use the taser to tase him, same thing, that didn't hurt me, that didn't hurt me. And finally, he was hitting Stewart with the taser to try and get him to stop the car. He's effectively kidnapping the officer. He's got him in the car, he's not stopping the car. It's a terrifying situation. He's trying to get control of the situation, and he's textbook using a gradual increase of the use of force to try and gain compliance and try to stop the car. In this instance, though, when the officers entered upon the scene, they came in response to a citizen call that says, there's a car outside on the street that I don't recognize. And it's been there about 20 minutes with the engine running. So this is March, cold outside. The officers appear on the scene. They knock on the window. Well, first of all, they shine the lights. They see somebody inside, either sleeping, passed out. They don't know at that point, right? Then they knock on the window and address him, and he responds. But then as the officers are trying to get in, he drives away. Were there opportunities for Officer Rhodes to exit the car? And what was his duty in response to this situation and him exiting the car? You talk about him fearing kidnapping, but was there an opportunity to exit, and was there a duty to exit? I don't believe that under the case law, as it's cited by the district court, there's no duty for him to retreat. Was there an opportunity? But the opportunity, I mean, again, it is a terrifying situation that he's involved in, and there's a struggle going on, and when the car did stop, he's still struggling with him. Could he have gotten out of the car at the time when he got the car first to stop? Possibly, but also he could have taken off at the same time. That continues. It could have caused serious injury to him. And again, this is, I think, stacking. Let me just establish for the record, at the time this whole thing ensued, the officers didn't know what his blood level was. They didn't know that it was three times the level for the legal requirements. They didn't know that at that time, did they? No, but his conduct certainly would indicate somebody that was impaired. When we talk about the struggle, according to the record, Mr. Stewart never struck the officers. He kept just putting the car back in the gear, right? The officers admit that he didn't strike them. At one point, Officer Rhodes said that he did push him down. Pushed his hand away. Pushed his hand and also pushed him down into the floor, I think when he lost his taser. But anyway, generally, he's not fighting. So the struggle is Officer Rhodes trying to stop the car? Absolutely. And the defiance of Stewart, I mean, with a uniformed officer in the car telling him to stop, trying to wrestle with him to get him to stop, hitting him to get him to stop, all in response saying, that didn't hurt me, that didn't hurt me, tasing him to get him to stop. Was Officer Rhodes required to use the close-range stun feature of his taser before using the actual gun? Was he required to use the close-range stun? I don't think there's any requirement. There was no requirement that he had to. He's certainly using, going up the continuum of force. And my understanding from the testimony is that it wouldn't have mattered because he was so close. He was using it in a drive-stun fashion. But isn't there a close-range stun feature for that purpose? You know, I'm not sure. I know he tried to use the stun feature, but if I recall correctly, it basically had the same result because of how close he was and something to do with the electrical, the connection to the body. We're not far enough apart to get that type of. So at what exact point in the encounter do you contend that lethal force became appropriate and or justified? I think it, I mean, I think it really at almost any point after he's tried to get him to stop and the car is starting to accelerate that he would be able to justifiably use deadly force. But in this circumstance, he, the important point is what we're dealing with in this case, is he went through absolutely every, I mean, without completely Monday morning quarterbacking it, he went gradually up the increased use of force to where he had to use deadly force. Just because the car had stopped, he had already almost hit a telephone pole. He had jumped the curb twice. He almost hit a telephone pole, you say. But the record says that while he was being either stunned or hit, the car went up on the curb and went around the pole. So what do we know that establishes that he almost hit a telephone pole? The testimony of Catalini? That says he went around the telephone pole. He's off of the road. Now he's on the tree line. He's off of the road as a result of the officer's actions toward him, isn't he? Again, there is nothing, again, this is the district court, I believe, got it absolutely right. And it embodies, and that court embodied the textbook applications of the principles of the Supreme Court and this court in that you can't look at the case with hindsight and careful reflection when you have a quickly evolving situation where the officer is making on-the-spot determinations of how to stop the car for his own safety, which the fear of going through the front windshield or otherwise being seriously injured if the car goes even faster. I mean, it's the possibilities. But over the entire length of this encounter, the record says the car never exceeded speeds of 20 to 30 miles per hour. I would suggest that 30 miles an hour is quite fast to get into an accident and certainly to try and leave the vehicle. Is 20 miles per hour, would you have the same argument? I think 20 miles an hour you probably would. And there's another important component on this is the officer is, when he's accelerating forward, he's putting the car into neutral and Stewart is putting it back into drive. So it's reasonable from an officer's perspective that this case, that the car could be going much, much faster. But the legal point with regard to clearly established law, there is no case on point that is controlling and there is certainly no robust or consensus of persuasive authority. So are we getting into a point now where we are establishing or sanctioning a provision that says, if a citizen fails to obey an officer's command, that the officer is justified in shooting? I know that sounds at this point kind of over the top, but what is the offense initially that the officer is investigating? What is he suspected of having done? I mean, I guess it would be obstruction. Obstruction of what? Obstruction of an investigation? Of official business or denying or not failure to comply with an officer's order. That's the question I just asked you. The problem that occurred is when he's being instructed to stop, he's putting the car in gear and starting to take off, and that's what prompted the officers to try and get control of the situation. At that point, he's ramming into the front of the car, and now you have a situation where it's chaotic, it's out of control, and the officers are certainly within their rights to try and get that under control. But the issue here has to do with the use of deadly force. And as the district court found, from a constitutional standpoint, based on the circumstances facing Officer Rhodes, it was a constitutional use of force. And even more so, there's no clearly established law under these specific factual circumstances that's required by the Supreme Court that would establish that Officer Rhodes would not be entitled to qualified immunity. How many times did he shoot him? Three times. And after the second shot, he was starting to try and strike him, and he shot one more. Where did he shoot him? Two in the chest and then one in the neck. Okay. CM. Could that have potentially created harm to the public? Because now you've got a car that really is out of control because the driver is now bleeding out, I guess. Yeah, there's a lot of, I mean, certainly the officer is faced with a lot of very difficult choices in this case, and that's one of the reasons why immunity applies. But I would say at that point when the force was used, the car was put out of gear at that point, and it was at that point. So the car, I don't think, was speeding along at that point. It got it in neutral. Well, now let's admit it was never speeding along because the highest speed was 30. I understand what you're saying. I would say that if you have an officer that is telling you to stop the car and struggling with you to try to get the car stopped, that 30 miles an hour is speeding along. Okay. Thank you very much for your time. Thank you. So Appellee has addressed this case not directly on point question, but in fact the Supreme Court stated in White v. Pauley as recently as 2017, which is one of the cases that talks about the need for some level of specificity, the Court said, Appellant need not present a case directly on point for a right to be clearly established. And the line of cases in this circuit makes the fundamental question here clear and clearly established, which is, was there at the time of the shooting with a vehicle as a potential deadly weapon and actual and imminent threat of death or serious physical harm? Now Luke Stewart and his family suffered immeasurable pain and loss at the hands of Defendant Rhodes, who shot him several times. Rhodes has offered implausible justifications for shooting Luke, has admitted that he shot Luke preemptively based on the desire to stop him from fleeing and based on speculation about potential risks, which only appeared because of Rhodes' own conduct and uses of force against Luke while he was driving and in the absence of an actual and imminent threat of death or serious physical harm. The totality of the circumstances applies here. Rhodes created any unreasonable and unnecessary danger in this situation, and this goes to the objective reasonableness of his conduct. And, in fact, he admitted while this was going on that he did have the chance to get out. He chose not to. He created the situation. Luke's family deserves their day in court for a jury to decide whether or not Rhodes' accounting of the shooting adds up, to determine whether Rhodes has been truthful. He has a lot of contradictions in the record about when and why he did certain things and used different force, and to determine whether or not his spins on the justifications for shooting Luke Stewart should be believed and ultimately to decide whether or not Rhodes violated Luke Stewart's constitutional rights. Likewise, his family deserves to have a jury decide whether the city of Euclid's repugnant and disgusting training and policies, which encouraged Euclid police officers, including Rhodes, through humor to exceed the constitutional limitations on the use of deadly force. This training is absolutely shocking. I'm sure you've seen it in the briefing. It has no place in police training. It is outright racist and disgusting. This is the environment in which Rhodes shot and killed Luke Stewart. The department is liable, the city is liable, and Rhodes committed a constitutional violation here. All of these questions are within the province of the jury. They're not meant to be decided by the district court. In close cases like this one, the district court said this was a close case with inferences to be drawn, truth to be established. These are precisely the kind of cases that have to go to a jury. They have to survive summary judgment because the district court cannot substitute its own judgment for that of a jury in the fact-finding process. Ultimately, the family deserves its day in court. We can't allow the civil rights laws in this country to be gutted every time a decedent's family doesn't have an independent witness to testify in court because the officer has shot and killed their loved one. For these reasons— The Westby case came later, and that said that you need a very specific prior case, right? Well, we do have, again, a number of cases that illustrate the principles and the rights here that are part of the fundamental question of this case, and there are other cases long preceding this one. For example, the Gonzales case, yes, out of another district, nonetheless—or another circuit, nonetheless establishing that this kind of conduct is absolutely unconstitutional. And for these reasons, we ask this court to reverse the district court in its entirety and remand this case for trial. Thank you. Thank you. I want to thank the parties for their arguments. The matter is submitted, and we will issue our opinion after consideration of the full panel. Thank you. I believe there are no more cases set for oral argument. That being the case, the clerk may adjourn court.